UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

PATRICIA W. WOLTERSDORF,            }
                                    }
    Plaintiff,                      }
                                    }
        v.                          }       CASE NO. CV 00-B-2252-S
                                    }
FIRST NATIONAL BANK OF              }
ATLANTA d/b/a WACHOVIA              }
BANKCARD SERVICES,                  }
                                    }
    Defendant.                      }

FILED
SEP 30 2002
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

ENTERED
OCT - 2 2002

## MEMORANDUM OPINION

Currently before the court is a Motion for Summary Judgment filed by defendant First National Bank of Atlanta, d/b/a Wachovia Bank Card ("Defendant" or "Wachovia"). Plaintiff, Patricia Woltersdorf ("Plaintiff" or "Woltersdorf") commenced this action by filing a complaint in the Circuit Court of Jefferson County, Alabama. Defendant timely removed this matter to this court. Plaintiff later amended her complaint, and now asserts state law claims of invasion of privacy, defamation and intentional infliction of emotional distress. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted in part and denied in part.

## I. FACTUAL SUMMARY[1]

This lawsuit, when distilled, involves the manner in which defendant attempted to collect a disputed debt, and the resulting harm alleged by the plaintiff when defendant gave information regarding her failure to pay these debts to credit agencies who, in turn, passed this information along to their customers.

Wachovia's records listed two credit cards in the name of Woltersdorf, one individual account and another joint account with her husband. Woltersdorf claims her husband forged her signature to obtain the joint credit account. (Woltersdorf Dep. at 35-36.) It was not until after his death in August 1999 that she discovered this Wachovia account, and other "secret" joint accounts on which her husband had run up considerable debt. (Woltersdorf Dep. at 29, 37, 51-54, 71, 92-94.)

Wachovia attempted to collect on the individual account and the joint account once they became past due, which was around August 1999.[2] (Woltersdorf Dep. at 53-54, 92-93, 128-30; *see also* Woltersdorf Aff., Experian Credit Report of 2/28/01, at 5-6.) Defendant's collection efforts consisted of letters and phone calls. In the letters, Wachovia reminded Woltersdorf of the debt, requested payment, notified her that her accounts were temporarily closed, advised that legal action was being considered by Wachovia to collect the debt, and that the debt had been accelerated. (Flocco Decl. ¶¶ 3-4; Exs. A-B.) Wachovia acknowledges sending plaintiff twelve

---

[1]Although some statements of fact are disputed, the evidence is cited in the light most favorable to plaintiff, the non-moving parties, and all reasonable inferences from admissible evidence are drawn in favor of plaintiff. *See e.g., Patrick v. Floyd Med. Ctr.,* 201 F.3d 1313, 1315 (11th Cir. 2000).

[2]The information to follow in this paragraph pertains to collection activity on both accounts, not just the joint account.

2

letters in total; this number does not include the ten bills generated and sent by Wachovia during this time. (Def.'s Reply Br. at 4; Def. Ex. 3, Flocco Dep. II, Exs. A-D.) Representatives of Wachovia had six phone conversations with Woltersdorf during this time, and left at least twenty two answering machine messages for her.[3] Wachovia contends that each communication was carried out in a professional and courteous manner. According to the activity log regarding her accounts, Wachovia representatives made several additional attempts to reach plaintiff by telephone, but were unable to do so and chose not to leave messages on plaintiff's answering machine. (Flocco Dep. I, Exs. 1, 5.)

Woltersdorf argues that she is not responsible for the debt on the joint account, and contends that she personally notified Wachovia of this fact several times. (Woltersdorf Dep. at 228-29; *id.* Exs. 5-7.) In addition, she retained a lawyer to "handle all her affairs," and advised Wachovia on multiple occasions that contact regarding the accounts should be directed to him. (*See, e.g.*, Woltersdorf Dep., Ex. 5, 7.) On August 12, 1999, Woltersdorf's lawyer sent Wachovia the following letter, which was stamped received August 18, 1999:[4]

> Please be advised that this firm is representing Mrs. Patricia Woltersdorf in the matters involving the above referenced account. Her husband, Mr. John Woltersdorf, is deceased as of July 29, 1999. There are issues concerning the above referenced account and any responsibility Mrs. Woltersdorf may have for

---

[3]Defendant documents telephone conversations with Woltersdorf on August 8, 15, 18, 23, October 10, and November 17. (Flocco Dep. II at 236-44, 248-49; *id.*, Ex. 9). Defendant admits leaving answering machine messages on the following dates regarding the accounts: August 5, 29; September 14, 21 (twice), 28, 29; October 4, 6 (twice), 10, 13, 25, 26; and November 2, 8, 13, 16 (twice), 18, 23 (twice). (Flocco Dep. II, Exs. 1-8). The letters were written on August 25; September 3, 9, 18, 25 (twice); October 5, 12, 26; November 24; and December 3, 4. (Flocco Decl. ¶¶ 3-4, Ex. A, 1-8; *id.*, Ex. B 1-4; Flocco II Dep., Ex. 2.)

[4]Woltersdorf's lawyer actually sent two letters, one referencing each account. (*See* Flocco Dep. II, Ex. 20.)

3

>the balance of the account. As of this date, Mrs. Woltersdorf is declining and disputing any responsibility for the debt associated with that account. If you have any questions concerning this account, please contact me at the above referenced office. **DO NOT CONTACT MRS. WOLTERSDORF FROM THIS DATE FORWARD**.

(Flocco Dep. II, Ex. 20.).

Additional letters sent by her lawyer, dated September 8, 1999, and October 7, 1999, repeated this information, and contained requests for documentation regarding her accounts. (Lorant Aff. at 3-4.)

Wachovia did not make inquiries within the company regarding her responsibility on this debt,[5] nor did it comply with the requests that her lawyer be contacted instead of plaintiff until Woltersdorf served the company with legal papers. (*See* Flocco Dep. II, Exs. 1, 5.) Wachovia also waited until November 26, 1999, to contact the Social Security Administration to verify Mr. Woltersdorf's death. (*Id.*) Wachovia states that in August the plaintiff promised to forward a copy of her husband's death certificate, but that it never received the certificate. (*See id.*; Flocco Dep. II at 260.) Defendant was not, however, unaware of Mr. Woltersdorf's death. Woltersdorf personally advised the Defendant of this fact, and the letters from Woltersdorf's lawyer did as well. (Woltersdorf Dep. at 228-29; *id.*, Exs. 5, 7; Lorant Aff. at 1-4.) Wachovia's records contain several notations indicating that Mr. Woltersdorf had died; the first entry occurs on August 8, 1999. (Flocco Dep. I, Ex. 5.) Nevertheless, Wachovia sent letters addressed to Mr. Woltersdorf, and left answering messages for him, as late as November 16, 1999. (*See* Flocco

---

[5]Wachovia never sent her account(s) to its Dispute Department or its Fraud Department, (Flocco Dep. I at 115-16), nor did it attempt to verify her signature on the application for the joint account by cross-referencing it with the undisputed copy of her signature on the application for her individual account, (Flocco Dep. II at 173).

Decl. ¶¶ 3-4; *id.*, Exs. 3-4;Woltersdorf Dep., Ex. 8.)

Wachovia began reporting to different credit agencies in late November or early December 1999, that plaintiff had failed to pay her debts.[6] (Flocco Dep. I at 119-20.) This information was included on her credit report, which was sent to customers of the credit agency.[7] (*See* Def.'s Reply Br. at 9; Woltersdorf Aff., Equifax Credit Report of 2/28/01, at 3.)

Woltersdorf applied for a Visa Bank Card two times, in April and August of 2000, and was rejected both times because of her "Record of slow and/or past due accounts," and her "Record of bad debt." (Woltersdorf Dep., Ex. 16, Letter from CB&T to Woltersdorf of 8/25/2000 & Letter from CB&T to Woltersdorf of 4/7/2000.) The rejection letter of April 5, 2000, also states: "In compliance with the Fair Credit Reporting Act, your application was declined either wholly or partly because of information obtained from a consumer reporting agency." (*Id.*)

## II. SUMMARY JUDGEMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e)

---

[6]In Wolterdorf's Credit Report generated by Experian on February 28, 2001, for example, both accounts are listed as "charged off," and the "past due" status is reported as beginning in August 1999. (Woltersdorf Aff., Experian Credit Report of 2/28/01, at 5-6.)

[7]It appears Equifax, a credit agency, received twenty six requests for Wolterdorf's credit report between October 25, 1999 and February 27, 2001. (Woltersdorf Aff., Equifax Credit Report of 2/27/01, at 3.)

requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston,* 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. DISCUSSION

**I. Invasion of Privacy**

**A. Wrongful Intrusion**

Woltersdorf's wrongful intrusion claim is based on what she characterizes as the harassing manner of defendant's collection efforts. The Alabama Supreme Court recognizes the tort of invasion of privacy based on wrongful intrusion, *see Norris v. Moskin Stores, Inc.,* 132 So. 2d 321 (1961), and has adopted the following definition of invasion of privacy based on wrongful intrusion:

> 'One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of his privacy if the intrusion would be highly offensive to a reasonable person.'

*Logan v. Sears, Roebuck & Co.,* 466 So. 2d 121, 123 (Ala. 1985) (citing Restatement (Second)

of Torts § 652B (1977).

Acquisition of information from a plaintiff is not a requisite element of a wrongful intrusion cause of action. *Phillips v. Smalley Maintenance Servs., Inc.*, 435 So. 2d 705, 709 (Ala. 1983). Rather, the plaintiff can pursue a claim when "the *means* of gathering the information are excessively objectionable and improper." *Johnston v. Fuller*, 706 So. 2d 700, 702 (Ala. 1997); *see also Hogin v. Cottingham*, 533 So. 2d 525, 531 (Ala. 1988) (stating that wrongful intrusion occurs when there has been offensive and objectionable prying into information that is entitled to be private). The Court in *Phillips* stated that "one's emotional sanctum is certainly due the same expectations of privacy as one's physical environment." *Phillips*, 435 So. 2d at 706.

"The tort of invasion of the right of privacy, insofar as it applies to actions of a creditor in regard to his debtor, is 'the wrongful intrusion into one's private activities in such manner as to outrage or cause mental suffering, shame or humiliation to a person of ordinary sensibilities.'" *Liberty Loan Corp. of Gadsden v. Mizell*, 410 So. 2d 45, 47 (Ala. 1982) (citing *Norris*, 132 So. 2d at 323) (internal citations omitted). "The mere efforts of a creditor . . . to collect a debt cannot without more be considered a wrongful and actionable intrusion. A creditor has and must have the right to take reasonable action to pursue his debtor and collect his debt." *Norris*, 132 So. 2d at 323. It follows then that the creditor is subject to liability for wrongful intrusion invasion of privacy when its collections efforts "exceed[] the bounds of reasonableness."[8]

---

[8]It appears that this standard imposes a lower burden than that required for claims based on the tort of outrage or intentional infliction of emotional distress. *See American Road Service Co. v. Inmon*, 394 So.2d 361, 365 (Ala.1980) (stating that conduct to support outrage claim must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as utterly intolerable in a civilized society"); *accord Travelers*

7

*Jacksonville State Bank v. Barnwell*, 481 So. 2d 863, 865-66 (Ala. 1985); *see also Mizell*, 410 So. 2d at 48 (noting that evidence in cases "exemplifying unreasonableness" amounts to creditor behavior fairly characterized as a pattern of deliberate harassment or a "systematic campaign[] designed to vilify the debtor or expose him to public ridicule"); *see also* Restatement (Second) of Torts § 652B cmt. d ("Thus there is no liability for knocking at the plaintiff's door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt. It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff that becomes a substantial burden to his existence, that this privacy is invaded.").

In *Black v. Aegis Consumer Funding Group*, No. CIV A. 99-0412-P-S, 2001 WL 228062, at *7 (S.D. Ala. Feb. 8, 2001), the court found that the collection activity of the defendant-creditor fell "beyond the realm of reasonable action and well into the area of wrongful and actionable intrusion (invasion of privacy)." The court stated, "Plaintiff experienced, through the conduct of [the defendant's employee], a deliberate, 'systematic campaign of harassment'; approximately twenty phone calls within a period of about one month, mid-June to mid-July, 1997, late at night and early in the morning, at home and at work." *Black*, 2001 WL 228062, at *6. The collector also threatened the plaintiff and other members of her family. As an example, "he called at 11:30 p.m., warning plaintiff that he would be at her home 'bright and early' to get the car; he stated 'I will get the money from you either one way or another, and I'll start with your kids clothing." *Id.* at *2.

---

*Indem. Co. of Illinois v. Griner*, 809 So.2d 808, 810 (Ala. 2001).

8

Reversing the trial court's ruling granting defendant's motion to dismiss on the invasion of privacy claim, the Alabama Supreme Court, in *Norris v. Moskin Stores, Inc.*, found that the conduct alleged constituted "sufficient harassment" falling beyond the realm of reasonable action where defendant contacted members of the plaintiff's family. 132 So. at 325. In an effort to locate the plaintiff so that she could collect a debt, an agent of the defendant telephoned the plaintiff's wife and sister-in-law, suggesting that she and the plaintiff were having an illicit affair.[9]  *Id.* at 323; *see also Barnwell*, 481 So. 2d 863 (finding that defendant's conduct was "outrageous to a person of ordinary sensibilities" where it called debtor-plaintiff twenty-eight to thirty-five times over two months, and fraudulently altered the terms of the security instrument at issue in an to attempt to collect).[10]

In these cases, defendants contacted the debtor-plaintiff a significant number of times, and/or employed deceitful or malicious collection tactics. Although the record in this case does

---

[9]Describing one of the conversations, the court states:
"Plaintiff avers that an agent . . . of the defendants, while acting within the line and scope of her employment as such agent . . . , in attempting to collect money allegedly owed by plaintiff, by the use of the telephone, called plaintiff's wife on two occasions at the place where she was employed and stated, in substance, that the person calling was 'Doris,' that she had met the plaintiff in Indiana, that she had dated him, that she had to get in touch with plaintiff on a matter of importance, that said Doris wanted to meet the plaintiff alone and without plaintiff's wife being present, and said agent . . . left a telephone number[.]"

*Id.* at 175, 132 So. at 322.

[10]Defendant argues that the evidence in this case is comparable to the conduct alleged in *Windsor v. General Motors Acceptance Corp.*, 323 So. 2d 350 (Ala. 1975). In that case, the court found no scintilla of evidence in support of the plaintiff's invasion of privacy claim where she was subjected to approximately twenty contacts, either in-person or by telephone, regarding her delinquent car payments over a one to two year period. *Windsor*, 323 So. 2d at 351. However, the evidence in this case consists of several more communications in a significantly shorter period of time.

not establish that Wachovia acted with malicious motive, the court finds that its behavior was reckless and sufficiently unreasonable to subject it to potential liability on Woltersdorf's wrongful intrusion claim. During the four month period at issue in this case, between August 1999 and November 1999, Wachovia contacted Woltersdorf at least forty-six times, counting telephone conversations, answering machine messages, letters and bills. Furthermore, the collection activity on Woltersdorf's accounts was in violation of Wachovia's own policies.

Wachovia specifically adopts the practices embodied in the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, 1692a-1692o (1994). (*See* Pl.'s Ex. 6.1, at 1.) This Act expressly prohibits communication with a debtor once the creditor has been informed the debtor is represented by counsel with respect to a debt. 15 U.S.C. § 1692c(a). The Act also states, "If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt[.]" *Id.* § 1692c(c).

On August 18, 1999, Wachovia received the first letters from Woltersdorf's lawyer. At this point, Wachovia had notice, in writing, that (1) Woltersdorf was represented by counsel with respect to her Wachovia debts, (2) Woltersdorf disputed and denied responsibility for both the individual account and the joint account, (3) she desired further communication regarding her Wachovia accounts to be sent to her lawyer, and not her, and (4) Mr. John Woltersdorf, an individual listed on the joint account, was deceased. Woltersdorf and her lawyer reminded Wachovia of these facts several other times. However, at no time prior to the filing of this lawsuit in late November, over three months later, were any efforts made to stop contacting

Woltersdorf. Once plaintiff's counsel wrote defendant, defendant should have ceased communication with the plaintiff.

Woltersdorf was entitled to have Wachovia cease communicating directly with her. This did not happen. Rather, representatives of Wachovia repeatedly attempted to contact her. Wachovia's policy manual prohibits personnel from making "repeated and continuous phone calls to any person with respect to the collection of the debt[.]" (Pl.'s Ex. 6.1, at 2.) Viewing the facts in the light most favorable to the plaintiff, the court is of the opinion that a reasonable jury could find that Wachovia's collection efforts exceeded the bounds of reasonableness. Therefore, defendant's motion for summary judgment as to plaintiff's wrongful intrusion/invasion of privacy claim is due to be denied.

**B. False Light**

Woltersdorf says that she was portrayed in a false light when inaccurate information concerning her record of debt repayment was sent by Wachovia to different credit agencies who subsequently passed that information on to their customers. The Alabama Supreme Court recognizes the tort of false light invasion of privacy, and has adopted the definition of that claim contained in the Restatement (Second) of Torts § 652E, which states:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if
> (a) the false light in which the other was placed would be highly offensive to a reasonable person, and
> (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Schifano v. Green County Greyhound Park, Inc.*, 624 So. 2d 178, 180 (Ala. 1993).

"Publicity" is an element of two invasion of privacy claims – false light and "giving publicity to private information about the plaintiff that violates ordinary decency." *See Johnston v. Fuller*, 706 So. 2d 700, 702 (Ala. 1997); *Key v. Compass Bank, Inc.*, No. CV-99-541, 2001 WL 1450657, at *7-*8 (Ala. Civ. App. Nov. 16, 2001). In cases construing the latter claim, the Court has relied on comments in the Restatement (Second) of Torts § 652D discussing publicity, which state:

> "Publicity" . . . means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. . . .
> Thus, it is not an invasion of the right of privacy, within the rule stated in this Section, to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term as it is used in the Section.

Restatement (Second) of Torts § 652D cmt. a; *see also Johnston*, 706 So. 2d at 702; *Key*, 2001 WL 1450657, at *6.

The concept of publicity, as quoted above, applies with equal force to false light claims. *See Swanson v. Albano*, 37 F. Supp. 2d 1312, 1332 (M.D. Ala. 1998). In the following cases, the courts have dismissed the plaintiff's invasion of privacy claims for failure to produce sufficient evidence of publicity. *Cartwright v. Tacala, Inc.*, No. 99-W-663-N, 2000 U.S. Dist LEXIS 20500, at * 42-*43 (N.D. Ala. Nov. 1, 2000) (finding insufficient "publicity" where defendant made accusations on three occasions to room of eighteen people); *Hoover v. Tuttle*, 611 So. 2d 290, 292 (Ala. 1992) (finding false comments made about an applicant during an executive meeting and not repeated did not subject plaintiff to "publicity that would violate ordinary decencies or that would create a false image of [the plaintiff] in the public's eye"); *see also*

12

*Swanson*, 37 F. Supp. 2d at 1332 (finding publicity element not met where defendant made statements to limited audience of three people); *Johnston*, 706 So. 2d at 703 (finding "publicity" not established when information was not "shown to the public at large or to a large number of people.").

The evidence Woltersdorf claims placed her in a false light is the allegedly false information regarding her failure to pay her debts as they become due, which Wachovia reported to three credit agencies. The record is not clear regarding the number of agency customers that actually received this information. This deficiency is insignificant, for the court finds that the evidence, when viewed in the light most favorable to Woltersdorf, falls well short of that required to establish publicity.

Publicity, as it is defined in the Restatement, requires that the matter placing the plaintiff in a false light be substantially certain to become public knowledge, at least within a relative community. The readership of even a small town newspaper or the audience of a radio station with limited bandwidth comprises a potential group of people far larger in number than the twenty-six customers indicated in the Equifax Credit Report. Furthermore, those privy to plaintiff's credit report are members of a well-defined group, entities interested in extending credit to Woltersdorf. The court would be forced to strain the meaning of "publicity" to find that Wachovia made public Woltersdorf's credit information when only twenty-six lenders obtained this knowledge, not otherwise accessible, over the course of approximately one year and four months. No Alabama cases read "publicity" so broadly. Based on this evidence, the court is of the opinion that Woltersdorf offers insufficient proof of "publicity," which is an element of her false light claim.

The court concludes that defendant is entitled to judgment as a matter of law on plaintiff's false light/invasion of privacy claim.

## II. Defamation – Libel

Woltersdorf's defamation claim is based on information given by the defendant to credit reporting agencies indicating that she failed to pay several debts and was delinquent on another. To establish a defamation claim under Alabama law, a plaintiff must prove:

(1) a false and defamatory statement concerning the plaintiff;
(2) an unprivileged communication of that statement to a third party;
(3) fault amounting at least to negligence on part of the defendant; and
(4) either actionability of statement irresepective of special harm or the existence of special harm caused by publication of the statement.

*McCaig v. Talladega Publ'g Co.*, 544 So. 2d 875, 877 (Ala. 1989) (citing Restatement (Second) of Torts § 558 (1977)).

Defendant moves for summary judgment on this claim arguing only that it fails as a matter of law because the plaintiff "failed to plead, claim, or testify to any special damages."[11] This assertion embodies a correct statement of the law for claims based on language that is not defamatory per se. *See Clark v. America's First Credit Union*, 585 So. 2d 1367, 1371 (Ala. 1991); *Myers v. Mobile Press-Register, Inc.*, 266 Ala. 508, 511, 97 So. 2d 819, 821 (1957) ("When the language used is not actionable per se, it is incumbent upon the plaintiff to allege special damages. Appellant alleges no special damage in either count in the instant case;

---

[11]As to the second element of plaintiff's case, the court notes that "it appears that such a report to a credit agency is generally held to be qualifiedly privileged, i.e., not actionable if made in good faith to another having a corresponding interest." *Liberty Loan Corp. of Gadsden v. Mizell*, 410 So. 2d 45, 50 (Ala. 1982) (citing 53 C.J.S. *Libel and Slander* § 119 (1948)). This issue, however, is not currently before the court as the parties did not raise it.

14

therefore, the publication complained of must be libel per se or the complaint states no cause of action.") (citations omitted).[12]

The language at issue is not defamatory per se. The Alabama Supreme Court has specified that "'words charging nonpayment of debts . . . are actionable without special damages being shown when they refer to merchants, tradesmen, or others in occupations where credit is essential.'" *Mizell*, 410 So. 2d at 49 (citing *Harrison v. Burger*, 103 So. 842, 843 (1925)). Although Woltersdorf's claim is founded on words charging nonpayment of debts, she is not a merchant, tradesman or the like.[13] Therefore, the court must examine the record to determine whether the plaintiff has asserted special damages.

Special damage refers to injuries that occur as a natural and proximate consequence of the alleged defamatory statement, *Harrison*, 103 So. at 844, and includes the loss of "some material or economic advantage as opposed to mental suffering or loss of community esteem." Jenelle Mims Marsh & Charles W. Gamble, *Alabama Law of Damages* § 36-28, at 525 (4th ed. 1999); *see also Age-Herald Pub'g Co. v. Waterman*, 66 So. 16, 20 (1913) ("Special damages are such as in fact have actually occurred as the result or consequence of the injury complained of, and not implied by law.")

The court finds the *Harrison* case particularly instructive. In that case, the plaintiff brought a libel claim against the defendant, who was a member of a retail credit association "one

---

[12] Once special damages are proved, the plaintiff may recover general damages, like mental anguish, on her libel claim. *See* Restatement (Second) of Torts § 575 cmt. c; *id.* § 623 ("One who is liable to another for a libel or slander is liable also for emotional distress and bodily harm that is proved to have been caused by the defamatory publication.").

[13] Woltersdorf is a computer technician. (Woltersdorf Dep. at 14-19.)

15

object of [which] was to ascertain and repeat to its various members regarding the promptness with which the customers of the various members paid their accounts," *Harrison*, 103 So. at 842-43; the plaintiff was not engaged in an occupation where credit was essential, *id.* She alleged that defendant falsely reported to other members of the credit association that plaintiff owed a debt, which impaired her credit as she was unable to get credit at other stores in the community. *Id.* Although the Alabama Supreme Court concluded the "report" was not actionable per se, it found that the plaintiff alleged sufficient evidence of special damages to maintain a libel claim where, "as a consequence of the false publication [to the credit association,] plaintiff's credit was impaired, and . . . she was in fact unable to get credit at other stores in Birmingham." *Id.* at 844.

Wachovia does not dispute that it made reports to credit agencies, or that the agencies made the information in their report known to their customers. (Def's Reply Br. at 9.) These reports indicate that Woltersdorf failed to pay some debts and that she was delinquent on others. On several occasions, Woltersdorf notified Wachovia that she disputed owing many of the debts that were later reported. There is at least a genuine issue of material fact as to whether the reports were defamatory.

Woltersdorf contends that she applied for a credit card on two occasions, but was denied each time based on information in her credit report, supplied by Wachovia, indicating she had a record of bad debt. Accepting plaintiff's allegations as true for purposes of defendant's summary judgment motion, Woltersdorf, like the plaintiff in *Harrison*, was unable to obtain further credit based on actions of the defendant. Following the *Harrison* court's rationale, the court finds that Woltersdorf's injury amounts to a loss of "some material or economic

16

advantage," and is sufficient evidence of special damages.[14]

Defendant does not argue that other elements of plaintiff's claim are insufficient. Therefore, finding evidence from which a reasonable jury could conclude Woltersdorf sustained special damages, the court is of the opinion that Woltersdorf's defamation claim is entitled to survive summary judgment.

### III. Intentional Infliction of Emotional Distress

Woltersdorf brings her claim for intentional infliction of emotional distress based on the same conduct alleged in her other counts. Woltersdorf's evidence, however, is not compelling enough to meet the high hurdles imposed under Alabama law to sustain a claim for intentional infliction of emotional distress. The conduct alleged must be "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as utterly intolerable in a civilized society." *Travelers Indem. Co. of Illinois v. Griner*, 809 So.2d 808, 810 (Ala. 2001) (citing *American Road Service Co. v. Inmon,* 394 So.2d 361, 365 (Ala.1980)).

Although Wachovia initiated several communications, none may be properly characterized as threatening or hostile. The court is of the opinion that no reasonable jury could find that the conduct alleged was either extreme or utterly intolerable. Therefore, summary judgment is due to be granted as to Woltersdorf's intentional infliction of emotional distress claim.

---

[14]Additionally, this case presents far more substantial evidence than that alleged in *Liberty Loan Corp. of Gadsden v. Mizell,*, where the Court found that the psychiatrist-plaintiff's allegations of damage, consisting of embarassment and attorneys' fees, did not amount to special damages. 410 So. 2d at 45.

## IV. CONCLUSION

For the reasons stated herein, the court is of the opinion that defendant's Motion for Summary Judgment is due to be granted in part and denied in part. An Order in accordance with this Memorandum Order will be entered contemporaneously herewith.

**DONE** this 30th day of September, 2002.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge